UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
M&T MORTGAGE CORP.,

                    Plaintiff,

        v.

LEO WHITE, et. al.,

                    Defendants.

          and                            04-CV-4775 (NGG)(VVP)
LEO WHITE,

              Third-Party Plaintiff,

        v.

BETTER HOMES DEPOT, INC.,
MADISON HOME EQUITIES, INC. et. al.,

             Third-Party Defendants.
-----------------------------------------------------------------x
LINDA COUNCIL and KIMBERLY COUNCIL,

             Plaintiffs,

        v.

                            04-CV-5620 (NGG)(VVP)
BETTER HOMES DEPOT, INC.,
MADISON HOME EQUITIES, INC. et. al.,

             Defendants.
-----------------------------------------------------------------x
POHORELSKY, Magistrate Judge:

## REPORT AND RECOMMENDATION

      The parties in the above-captioned cases have moved for summary judgment, and Judge

Garaufis has referred the motions to me for a report and recommendation pursuant to 28 U.S.C. §

636(b)(1(B). Both cases arise out of materially similar transactions, which consist of the

plaintiffs'[1] purchase of a dwelling from the defendant Better Homes Depot, Inc. ("Better Homes"

---

[1] Although White is actually a third-party plaintiff rather that the initiating plaintiff in his case, the court will refer to White and the Councils collectively as the plaintiffs, unless otherwise specified – especially since, for the purpose of the instant motions, the involvement of the plaintiff, M&T Bank, is minimal.

or "BHD") financed by a mortgage issued by the defendant Madison Home Equities, Inc. ("Madison" or "MHE"). The allegations sound primarily in fraud, conspiracy, deceptive trade practices, and federal housing discrimination in connection with those transactions. The Better Homes defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 against the plaintiffs, Leo White, Linda Council, and Kimberly Council, while White and the Councils have cross-moved for partial summary judgment on many of their claims. For the reasons that follow, the undersigned finds that genuine issues of material fact remain, and respectfully recommends that both BHD motions be DENIED and that the White and Council motions be DENIED as well.

## BACKGROUND

The facts on which the court relies will be drawn from the Local Civil Rule 56.1 Statements of Fact that the parties have filed, as well as from the exhibits attached to the parties' moving papers, and from the pleadings, admissions, and prior discovery rulings that occurred. The transactions in question both occurred in 1999, when Leo White and the Councils separately purchased residential properties in Brooklyn, New York from Better Homes, with financing provided by Madison. At issue are the defendants' alleged representations that the properties were or would be converted into legal four-family (White) and two-family (the Councils) homes, that Certificates of Occupancy would be obtained, and that the premises would be substantially repaired and renovated. Their respective experiences with the defendants – including their discussions, the transactions at issue, and the events that ensued – are separately described below.

<u>*Leo White*</u>

At the time that White first approached Better Homes about purchasing a home, he was a 21 year-old African-American hotel doorman earning roughly $2,100 per month. He had not graduated high school. White was interested in purchasing a multi-family dwelling in the Bedford-Stuyvesant section of Brooklyn. To enable him to carry the mortgage that would be necessary, White wanted to have rent-paying tenants. Thus, he planned to live with his family on one floor, and collect rent from tenants on the other floors. Because White's aunt had previously purchased a home from BHD financed by an MHE mortgage, she took White to BHD and MHE offices to begin inquiries about buying and financing a home. Over a period of approximately one month, White had numerous meetings with Better Homes and Madison agents, including Glen John and Charles Styles, and was shown an estimated 20 houses. Although he initially agreed to purchase a different property, White ultimately settled on the purchase of a house at 164 Macon Street.

The premises at 164 Macon Street, which were built around 1899, consisted of a basement and four floors. The apartments on the first and second floors each have one bedroom, while the third and fourth floor apartments each have two bedrooms. It appears that the property did not have a Certificate of Occupancy ("CO") for use as a four-family dwelling at the time; White testified that the existing CO was for use as a three-family house. White testified, however, that BHD promised to perform any necessary repairs so that the property could be legally categorized as a four-family dwelling. White also testified that he was told by BHD and MHE agents – including John, Styles, Eric Fessler (the President of Better Homes), and Nadine Malone (the President of Madison Home Equities) – that he would be able to rent the three other

units in the home, and realize approximately $3,600 per month in rental revenue. Never having purchased a home before, however, White did not independently verify that information. Nor did he obtain an independent engineering inspection or appraisal, or independently investigate the house's market value or condition. White was not represented by an attorney when he signed the contract of sale, and does not remember speaking with or consulting anyone about its terms prior to signing. He did not object to any of the contract terms, and testified that he had read through and understood the document.

The MHE mortgage that White used to finance the purchase of 164 Macon Street was insured by the Federal Housing Administration (the "FHA"). The rental income he expected to realize was included on his mortgage application, subject to verification in the appraisal. At the behest of Madison, the residence was appraised by Robert Dosch, an employee of CLA Appraisals. His appraisal report contained the following provision: "The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner." The appraisal amount in his report essentially matched the purchase price, and was calculated on the basis that the legal occupancy status of the property was a four-family dwelling. Dosch's appraisal indicated that White would be able to rent each unit for $1,200 per month.

White remained without counsel until the closing, when he was represented by C. Peter David, an attorney who had been recommended to him by BHD or MHE. Better Homes had informed White that David's legal services were included as part of his down payment. White

stated that at the closing David told White that he had looked through the paperwork, and that everything was proper.

Prior to the closing, Better Homes performed a number of cosmetic repairs or renovations on White's home, including installation of ceramic flooring and stoves, painting, carpeting, sheet-rocking, and fixing a leak, and White indicated his satisfaction with the work. Roughly one year after moving in, however, the roof began to leak. White also experienced leaks in some of the piping, and encountered other problems with the chimney and windows. Shortly thereafter, the boiler broke, costing White approximately $2,000. White did not ask Better Homes to make repairs. Ultimately, although White did not realize the level of rental income he had anticipated, he continuously had at least one paying tenant in the premises, and frequently more.[2] When he failed to make his mortgage payments, foreclosure proceedings were initiated and While filed a bankruptcy petition in 2003.

### *The Councils*

The Councils, who are also African-American, learned of Better Homes after seeing signs on a house listing BHD as the seller, as well as from newspaper advertisements. Because the Councils were unable to remain in the apartment they occupied at the time, there was some urgency in finding a house or, at a minimum, another place to live. Although similarly inexperienced in real estate transactions, Linda Council and her daughter, Kimberly, had both earned college degrees and had done post-graduate work when they first came into contact with

---

[2]In 2003, he was collecting approximately $3,000 in monthly rental income, while in 2006 he was collecting $2,400 per month from the three rental units.

BHD and MHE.  Linda worked for the United States Postal Service, and together with Kimberly, they were earning approximately $74,000 per year.

After contacting BHD by telephone, they were shown several properties by Mitch Lewis, a Better Homes agent.  They ultimately became interested in a house at 102 Etna Street.  The property was undergoing extensive repair and renovation, and the basement was being redone. Linda Council expressed to Lewis her interest in obtaining rental income from the basement unit, and both Linda and Kimberly testified that Lewis represented to them that they would be able to rent out the basement for up to $1,200 a month.  While the house was undergoing renovation, Better Homes and Lewis "always made it clear that they would fix the house . . . to [their] specifications and what had to be done to the house."  Linda Council said she was specifically told that the dwelling was a two-family house, that the basement would be fixed and thus able to be rented out.  She was assured that "everything was going to be done that needed to be done, that the house would be up to HUD's codes, everything would be in working condition."  Like White, however, the Councils did not have an independent engineering inspection or appraisal performed, nor did they independently investigate the house's market value or condition.

In contrast to White, the Councils were represented by an attorney, Stephen Weinstock, prior to signing the contract of sale.  Weinstock had been recommended by Better Homes, who, according to Linda Council, had agreed to pay Weinstock's fees if the Councils retained him for the closing.  Weinstock was not associated professionally with Better Homes or Madison at the time.  He had previously been employed, however, by the firm that represented both Better Homes and Madison at the closing – Ackerman, Raphan & Sultzer – and Weinstock had previously represented MHE in other real estate transactions.  Council was at first cautious that

an attorney with offices in the same building as Better Homes would represent her, but was reassured by Weinstock that he worked independently of Better Homes, that the transaction was "backed" by HUD, and that he had her best interests at heart.  In addition, Council recalls being told of the "package" deal afforded by Better Homes' "legwork," and that everything was set up and could be completed in the same building.  Both Linda and Kimberly Council testified that Better Homes represented itself as a "one-stop" shop that would take care of everything, essentially a "package deal" for minorities and first-time home buyers.  Weinstock assured her that he had read the contract of sale, and that he understood and approved of the terms.  He said he would ensure that everything was legal, and he "reiterated numerous times that [the transaction] had to meet HUD's approval."

Madison was recommended to the Councils by Better Homes, and after executing the contract of sale, they met with MHE to provide financial information.[3]  Linda Council asserted that they would be able to make the monthly mortgage payments, though she may have been under the impression that the rental income would help with the monthly payment as well.[4]  The rental income was included on the application, subject to verification in the appraisal.  Like White, the Councils' home was appraised by Robert Dosch at the behest of Madison.  The appraisal carried the same provision as the one Dosch provided in connection with White's home:  "The appraiser has based his or her appraisal report and valuation conclusion for an

[3] The loan applications that accompanied both White's and the Councils' mortgages contained false information that White and the Councils disclaim.  For example, the Council application lists $25,000 in furniture and personal property, which Linda Council testified that she did not own and that she did not know was listed on the loan application form.  Similarly, White's application lists $50,000 worth of furniture and personal property.

[4] Council's deposition testimony on the rental income is not fully consistent, as she also testified that the rental would only provide a "cushion" if the mortgage proved too substantial for her income.

appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner." His appraisal for the Councils' home also essentially matched the purchase price, and the value was calculated on the basis that their home would hold legal occupancy status as a two-family dwelling. The estimated rental income listed in the appraisal was $900 per month.

At the closing, when Linda Council inquired whether signing the closing documents was in their best interests and whether their rights would be protected, she was given the same assurances she was given when the contract of sale was signed. Council stated she was not given enough time to read all the closing documents, but was told by Weinstock, "Don't worry about it. HUD has a stamp of approval on the house being the way it's supposed to be." He assured the Councils that the terms of the mortgage were "aboveboard," and that the transaction was "endorsed by HUD." Better Homes paid the closing costs, and the Councils ultimately executed a number of documents at or prior to closing without objection.

Better Homes performed repairs and renovations at the Councils' property both before and after the closing. The work included replacement of the flooring and sinks in accordance with specifications provided by the Councils, and other renovations involving the cabinets, ceiling, stove, and bathrooms. Linda Council testified that Weinstock had encouraged her prior to and at the closing to proceed with the transaction despite the renovations that remained to be done, and reassured her that BHD would complete the unfinished work. Better Homes also did some renovation work to the Councils' basement, installing sheet rock, carpeting, and tiles, which was completed by May 1999 when Kimberly Council and her family moved into it.

Roughly one year after moving in, the roof began to leak. Council contacted Better Homes, but the leak was not fixed until 2004.

Kimberly Council lived with her family in the basement for approximately three years, but was forced to move out because it became "unlivable." The Councils testified that they were never able to rent out the basement to a paying tenant because it remained unfinished, did not function properly, was "falling apart," and was uninhabitable. In addition, the basement was cited by the Buildings Department in a summons for an "illegal conversion" because the house was not a legal two-family home.[5] While Better Homes was at first somewhat responsive, eventually Council was told by someone at Better Homes (whom Council remembered as "Steve") that she was the home owner and that the issues identified (specifically with respect to the leaking roof) were her responsibility. Eventually, foreclosure proceedings were initiated against the property, and the Councils sought bankruptcy protection in 2003.

### *Other Facts Relevant to the Transactions*

The contracts of sale signed by White and the Councils state that their houses were being sold "as is"[6] – except that at closing, the plumbing, heating, and electrical systems would be in

---

[5] Council testified to a litany of structural issues, not limited to the basement, including electrical problems with the outlets, infestation by rats and other vermin, major sewerage and drainage malfunctions, poor or "crumbling" piping, disintegration of the sheet-rock, plumbing issues, rotten window sills, a broken skylight, the frame of the stairs leading to basement, leaking bathtubs, the cabinets "falling off," cracked tiles, the "break-down" of the boiler, water seepage, and brick instability. Council also testified that Better Homes had told her that the "boiler and the roof were new, were practically new. They were in excellent, mint condition."

[6] Paragraph 12 contained the following language:

Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition,

working order, and the roof would not have leaks.  The contracts state that "[e]xcept as otherwise expressly set forth in this contract, none of Seller's covenants, representations, and warranties or other obligations contained in this contract shall survive closing."  Finally, the contracts contain a standard merger clause: "All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their agreement and has been entered into after full investigation, no party relying upon any statement made by anyone else that is not set forth in this contract."  Riders to the contracts of sale contain representations concerning the legal occupancy of the respective dwellings.  For White, the rider states that the "seller represents that the premises is a legal four family dwelling," and for the Councils an identical representation is made that the premises are a legal one-family dwelling.[7]  The riders do not indicate that BHD was responsible for making, or had agreed to make any necessary repairs or renovations to the premises.  When asked about an engineer's inspection of the Councils' property detailing the work that would need to be done to the house, Weinstock testified that "normally such a writing would be added to the contract as a rider [and] signed by all the parties."

---

state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in present condition and state of repair, subject to reasonable use, wear, tear, and natural deterioration, between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(f)) [sic] without any reduction in the purchase price or claim of any kind for any change in such condition b[y] reason thereof subsequent to the date of this contract.  Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

[7] The contracts elsewhere state that the seller will provide a valid CO [or proof that no CO was required] authorizing use as a four-family (White) and one-family (the Councils) dwelling.

Although the nature of the relationship between BHD and MHE remains the subject of dispute, the contracts of sale contain the following disclosure provision: "It is hereby disclosed that there is a relationship between the seller and the lender." The plaintiffs contend that the full extent of the relationship was not made known. MHE would frequently lend money (in the millions, cumulatively) to BHD so that BHD could purchase the properties for eventual re-sale; in turn, BHD would frequently refer home buyers to MHE for the mortgages necessary to purchase the homes. FHA insurance protected MHE in the event of the borrower's default, and MHE often sold the mortgages it originated to another party. The buying institution would pay MHE fees in proportion to the principal, that is, a higher loan amount would generate higher fees when the mortgage was sold. The Riders to the contracts of sale make the sales "subject to the purchaser obtaining a mortgage commitment from Madison Home Equities, Inc., for a 25/30 year fixed or variable rate mortgage in the amount of . . ."[8] The abstract company, Paragon Abstract, which dealt with title documents, was also the same in both transactions, as was the "closer" for title purposes, Gail Zucker. As it happens, Zucker was Fessler's sister, and that relationship was not disclosed.

---

[8] As an example of a baseline fact that is acknowledged, but capable of different meanings, the court notes that the quoted language is ambiguous. It is not clear whether the seller requires financing by an MHE mortgage and *only* an MHE mortgage, or whether the contract requires only that the buyer obtain *a* mortgage, and that this particular mortgage happened to originate with MHE. It does seem probative, however, that the date of the contract, the identity of the buyer, the address of the property, the purchase price, and the occupancy status is all written out by hand, while the "subject to" clause appears in printed form like the rest of the contract. That Madison was used so often as to be included on the standard form could suggest the prior, more invidious interpretation, especially to an unsophisticated first-time home-buyer whose attorney was provided by the seller or the lender. Lastly, this language was also included in the Riders in 50 comparable transactions, although those 50 transactions were selected because Madison was the lender.

## *Discovery Sanctions*

As part of their argument in support of their motions for the summary judgment the

plaintiffs seek to rely on sanctions imposed on some of the defendants for their spoliation of

evidence.  Specifically, I found that in the event of a trial, the jury should be given the following

instruction:

> The defendants Better Homes Depot, Inc. and Eric Fessler, have admitted that
> they failed to produce or intentionally destroyed documents concerning the sale or
> repair of various properties which they were obligated to retain and provide to the
> court in this litigation. You may presume that the documents destroyed or not
> produced would have been important to the plaintiffs in proving whether
> promised repairs had been made at all and the extent of the repairs. You may infer
> from these circumstances and the evidence presented that Better Homes Depot,
> Inc. and Eric Fessler made no or minimal repairs to some or all of these properties
> before they were sold by Better Homes Depot, Inc. and Eric Fessler
> notwithstanding any other evidence that another party may have produced
> regarding repairs.

Decision and Order, dated September 28, 2007, at 5 (Docket Nos. 171 (04-CV-4775); 199 (04-

CV-5620)).  In addition, I ordered that Better Homes and Eric Fessler should be

> precluded from offering, at trial or in connection with any other proceeding in
> these actions, any documentary evidence concerning the sales of the properties
> identified on Schedule A of the Defendant/Third Party Plaintiff's First Set of
> Document Requests to Third-Party Defendant Better Homes Depot, Inc. with a
> Date of sale during the period from January 1, 1999 through May 30, 2000
> (hereafter the "Limited Schedule A") which are not contained in documents that
> they previously produced and which were covered by the plaintiffs' discovery
> requests to them, including without limitation documents not previously produced
> concerning repairs, contractors hired, contracts made, work performed,
> applications filed, building permits obtained and expenses incurred, [and] whether
> or not Fessler has give[n] testimony about any such documents.

*Id.*[9]

---

[9]  The plaintiffs also allege a deed alteration scheme pertaining to 96 properties on "Schedule A,"
wherein the deeds received did not actually reflect that BHD was a prior grantee and subsequent grantor
of the property.  Instead of the chain of title going from Smith to Better Homes, and then from Better
Homes to Jones, Better Homes would be "whited out," and the deed would purport to convey title directly

# DISCUSSION

## A.     Legal Standards on Summary Judgment

Summary judgment will be granted if no genuine issue of material fact remains to be decided and the undisputed facts warrant judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Inst. for Shipboard Educ. v. Cigna Worldwide Inc. Co.,* 22 F.3d 414, 418 (2d Cir. 1994).  If a reasonable jury could return a verdict in favor of the non-moving party,  a material issue of fact remains in contention and the motion for summary judgment must be denied.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  On the other hand, if the evidence in favor of the non-movant is "merely colorable" or so insufficient such that no rational trier of fact could find in its favor, summary judgment may be granted.  *Id.* at 248-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82 (1967)).  Any ambiguities and all inferences must be drawn in favor of the non-movant, and the court must view the evidence in the light most favorable to the non-movant.  *See Tufariello v. Long Island R.R. Co.*, 450 F.3d 80, 85, (2d Cir. 2006);  *Inst. for Shipboard Educ.*, 22 F.3d at 418; *Twin Labs, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990).  The court is charged not with weighing the evidence or even with determining the truth, but with ensuring that genuine issues of fact remain in dispute.  *See Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007) (citing cases).

---

from Smith to Jones, bypassing Better Homes.  Accordingly, BHD would avoid its tax obligations on those two separate transactions, and the buyers would receive defective title.  The defendants do not admit these allegations, but instead claim that BHD did not actually acquire title, and that both White and Council received valid legal title.  Because of inadequate, deficient responses on the part of the defendants, the undersigned deemed admitted some of plaintiffs' requests for admissions related to this "deed alteration" scheme.  *See* Docket Nos. 247 (White); 280 (Council).

The burden of proving that no material issue of fact remains in dispute rests on the moving party. *Celotex Corp.,* 477 U.S. at 322; *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). If the moving party meets that initial burden by making an evidentiary showing suggesting that no material factual issues remain, the burden then shifts to the non-moving party to produce evidence raising a material question of fact. *See* Fed. R. Civ. Pro. 56(e); *Miner v. Clinton County,* 541 F.3d 464, 471 (2d Cir. 2008); *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1998). Thus, to avoid summary judgment, the non-movant must set forth specific factual allegations. *Kurisoo v. Providence and Worcester R.R. Co.,* 68 F.3d 591, 594 (2d Cir. 1995); *Fahle v Braslow*, 913 F. Supp. 145, 149 (E.D.N.Y. 1996) (citations omitted). In this vein, conclusory, *ipse dixit* assertions are not sufficient to defeat summary judgment. *Western World Inc. v. Stock Oil Inc.,* 922 F.2d 118, 121 (2d Cir. 1990). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat summary judgment. Rather, 'there must be evidence on which the jury could *reasonably* find for the [non-movant].' Moreover, the opposing party must set forth 'concrete particulars' showing that a trial is needed." *Cousin v. White Castle System, Inc.,* No. 06-CV-6335, 2009 WL 1955555, at *4 (E.D.N.Y. July 6, 2009) (quoting *Anderson*, 477 U.S. at 252). Although the non-movant need not produce evidence in a form that would be admissible at trial, it cannot rest on the pleadings, and must set forth specific facts in affidavits, depositions, answers to interrogatories, or admissions on file, which together demonstrate a genuine issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex Corp.,* 477 U.S. at 324; *United States v. Rem*, 38 F.3d 634, 643-44 (2d Cir. 1994); *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *Grennan v. Nassau County*, No. 04-CV-2158, 2007 WL 9520067, at *5 (E.D.N.Y. Mar. 29,

2007).  That said, a non-movant who bears the burden of proof at trial is not required to submit affidavits, but may oppose the motion on the basis of the pleadings, depositions, and admissions on file.  *Celotex*, 477 U.S. at 324; *Patterson*, 375 F.3d at 219.  Moreover, a "verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."  *Patterson*, 375 F.3d at 219 (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001)).  The materiality of the facts is determined by the substantive law governing the claims, and whether they "might affect the outcome of the suit under the governing law[.]"  *Anderson*, 477 U.S. at 248.

Local Civil Rule 56 also directs litigants to file statements and counter-statements of material facts about which there is no dispute, and also requires that each factual statement be followed by a citation to admissible evidence, in accordance with Federal Rule 56(e).  The court, in its discretion, may "overlook a party's failure to comply with local rules, including Rule 56.1."  *Locke v. St. Augustine's Episcopal Church*, No. 07-CV-3226, 2010 WL 743924 , at *5 (E.D.N.Y. Mar. 3, 2010) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).  Even in the absence of a Rule 56.1 statement altogether, courts have proceeded to rule on the basis of the underlying evidence.  *See Locke*, 2010 WL 743924, at *5 (granting summary judgment for defendant despite failure to file Rule 56.1 statement); *Doe v. Nat'l Bd. of Podiatric Med. Examiners*, No. 03-CV-4034, 2004 WL 912599, at *3 (S.D.N.Y. Apr. 29, 2004) ("Plaintiff's motion will not be denied simply for failure to file a Local Rule 56.1 statement."); *United States v. Abady*, No. 03-CV-1683, 2004 WL 444081, at *2-3 (S.D.N.Y. Mar. 11, 2004) (defendant's failure to submit Rule 56.1 statement notwithstanding, court examines underlying

evidence and substance of the claim before granting summary judgment for plaintiff). Lastly, a court "may in its discretion, opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a [Rule 56.1] statement." *Holtz*, 258 F.3d at 73 (quoting *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)).[10]

## B. Standing

As a threshold matter, Better Homes maintains that the bankruptcy filings deprive White and the Councils of standing to assert their claims against the Better Homes defendants, and that those claims must therefore be dismissed. In support, they argue that the plaintiffs did not list the instant suits in the schedule of assets filed in their respective bankruptcy cases, and that the trustees of the bankruptcy estates have not abandoned these assets. Therefore, they argue, the causes of action remain the property of the bankruptcy estate, and the plaintiff-debtors lack standing to prosecute these claims on their own behalf. While this standing argument may have had some resonance if the plaintiffs had filed for bankruptcy protection under Chapter 7 (regulating liquidation) or Chapter 11 (regulating reorganization), White and the Councils filed under Chapter 13 (regulating the debts of individuals with regular income), which allows them to bring suit against the Better Homes defendants and does not deprive them of standing. *See Orlick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 515 (2d Cir. 1998).

---

[10] The court has exercised its discretion to overlook technical shortcomings with Rule 56.1 compliance and to conduct such a review. For example, the portions of the deposition transcripts cited herein provide ample evidence that genuine issues of material fact remain, even if they were not cited in the parties' Rule 56.1 statements or otherwise in the moving papers. *See also Holtz*, 258 F.3d at 73-74 (exploring function and purpose of local Rule 56.1); *Giannullo v. City of New York*, 322 F.3d 139, 140-43 (vacating and remanding grant of summary judgment because though not controverted by plaintiff's counter-statement, defendant's factual assertions in Rule 56.1 statement were not supported in the factual record). Thus, the court's more expansive review of the evidentiary record submitted by the parties ensured a more complete and thorough analysis of the factual background of this case, beyond the narrow confines sketched out in the parties' more parochial Rule 56.1 statements.

Filing under Chapter 13 changes the calculus when it comes to issues of standing in civil causes of action. "While Chapter 7 and Chapter 11 debtors lose standing to maintain civil suits – which must be brought and/or maintained by their bankruptcy trustees – it is clear that Chapter 13 debtors like plaintiff are *not* subject to this restriction." *Murray v. Bd. of Educ. of City of New York*, 248 B.R. 484, 486 (S.D.N.Y. 2000) (court's emphasis) (citing *Orlick*, 145 F.3d at 513). *Orlick* "conclude[d] that a Chapter 13 debtor, unlike a Chapter 7 debtor, has standing to litigate causes of action that are not part of a case under title 11." 145 F.3d at 515. *Orlick* goes on to quote the legislative history drawn from remarks in the Congressional Record: "[C]ertainly it is intended that the [Chapter 13] debtor has the power to sue and be sued." 145 F.3d at 516 (quoting 124 Cong. Rec. H. 11,106; S. 17,423). While *Orlick* and *Murray* present different facts from the cases at bar, the common thread – that Chapter 13 debtors, unlike their Chapter 7 or Chapter 11 counterparts, do not lose standing to bring a civil cause of action – plainly applies here. There is no reason that the broad principle applied in those cases ought to be restricted to the specific facts raised in those cases, the defendants' attempts to distinguish them notwithstanding. Any distinctions offered do not raise differences material enough to warrant a different outcome.

Numerous other cases also stand for the proposition that Chapter 13 debtors are not deprived of standing to assert pre-petition causes of action. *See, e.g.*, *Cable v. Ivy Tech*, 200 F.3d 467, 472-74 (7th Cir. 1999); *In re Stewart*, 373 B.R. 801 (Bankr. S.D. Ga. 2007); *In re Griner*, 240 B.R. 432, 435-39 (Bankr. S.D. Ala. 1999); *In re Freeman*, 72 B.R. 850, 854 (Bankr. E.D. Va. 1987) ("The reality of a filing under Chapter 13 is that the debtors are the true representatives of the estate and should be given the broad latitude essential to control the

progress of their case."). There is less of a distinction between the debtor and the estate under Chapter 13 than under Chapter 7 or Chapter 11. Here, the "estate" for purposes of the creditors' recovery, consists of little but the future earnings of the debtor. *See Orlick*, 145 F.3d at 516 (recognizing that in Chapter 13 proceedings, the "creditors' recovery is drawn from the debtor's earnings, not from the assets of the bankruptcy estate; it is only the Chapter 13 debtor who stands to gain or lose from efforts to pursue a cause of action that is an asset of the bankruptcy estate."). It does not appear that any creditor could benefit from bringing the instant cause of action. Perhaps tellingly, the defendants have not cited any federal case in which a court has dismissed a cause of action brought by or asserted against a Chapter 13 debtor on the basis of a lack of standing.

Lastly, it seems unduly burdensome to require the plaintiffs to have listed the instant lawsuits as a property right in their bankruptcy petitions, when there is evidence that as of the bankruptcy filings, they remained unaware that whatever grievances they held towards Better Homes could be litigated as a cognizable cause of action. It appears that the plaintiffs were contacted regarding this cause of action only *after* filing for bankruptcy, and that it was the possible foreclosure and bankruptcy actions that ultimately initiated the meeting with counsel and the realization of these causes of action. White, for example, met with Richard Wagner, one of the attorneys in both cases – who has unfortunately since passed away – only after the commencement of the bankruptcy case. In any case, this point will be explored in further detail below, as it constitutes a more central consideration in the discussion regarding statutes of limitation and equitable tolling. The plaintiffs should therefore be entitled to maintain these actions to the extent that individual claims survive summary judgment.

## C.      Statute of Limitations and Equitable Tolling

Statute of limitations issues are raised with respect to the three statutory claims that White and the Councils have brought.  For the deceptive practices claim under New York General Business Law Section 349(h), the statute of limitations is ordinarily three years, which begins to run when the injury occurs.  *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198, 271 (E.D.N.Y. 2001), *rev'd in part on other grounds*, 344 F.3d 211 (2d Cir. 2003) ; *Gaidon v. Guardian Life Ins. Co. of America*, 750 N.E.2d 1078, 1082 (N.Y. 1999); N.Y. Civil Practice Law and Rules § 214(2).

 For the discrimination claims, both the Fair Housing Act ("FHA"[11]) and the Equal Credit Opportunity Act ("ECOA") set forth a two-year statute of limitations period.  15 U.S.C. § 1691e(f); 42 U.S.C. § 3613(a)(1)(A).  The ECOA starts the clock on the "date of the occurrence of the violation," while the FHA period begins to run on the "occurrence or the termination of an alleged discriminatory housing practice[.]"  All three statutory claims in both cases were brought in 2004, beyond the limitation periods, if the dates of the transactions are used as the dates of injury or violation.  Were the inquiry that simple, it would end there and those statutory claims would be dismissed.

However, there is an issue of when the limitations period actually began, which the plaintiffs raise by virtue of an equitable tolling argument.  Generally speaking, equitable tolling allows plaintiffs to overcome an expired statute of limitations when they were "induced by fraud, misrepresentation, or deception to refrain from timely commencing an action."  *Gleason v.*

---

[11] The court also uses the acronym "FHA" to refer to the Federal Housing Administration, but context should make clear whether the reference is to the government agency or to the statute.

*Spota*, 194 A.D.2d 764, 765 (N.Y. App. Div. 1993); *see also Cardiello v. The Money Store, Inc.*, No. 00-CV-7332, 2001 WL 604007, at *4-5 (S.D.N.Y. June 1, 2001). The main consideration is whether the defendant "fraudulently concealed from the plaintiff his cause of action *during the time in which the plaintiff could have brought that action*." *Cardiello*, 2001 WL 604007, at *4 (emphasis in original); *see also Bailey v. Glover*, 88 U.S. 342, 349 (1874) (establishing the modern framework and theory for equitable tolling). In such circumstances, the limitations period begins to run when the plaintiff "discovered, or by reasonable diligence could have discovered, the basis of the lawsuit." *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C. Cir. 1977). The federal equitable tolling standard requires plaintiffs to establish three elements: (1) that the defendant concealed the existence of the cause of action from the plaintiff; (2) that the plaintiff brought suit within the applicable limitations period upon learning of the cause of action; and (3) that the plaintiff's ignorance of the claim did not result from a lack of diligence.[12] *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (citing authorities); *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986); *Cerbone v. Int'l Ladies Garment Workers Union*, 768 F.2d 45, 48 (2d Cir. 1985); *City of Detroit v. Grinnel Corp.*, 495 F.2d 448, 460 (2d Cir. 1974). With regard to the first prong, concealment is proven by showing that "the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083. In similar circumstances, plaintiffs can be said to have learned of the cause of action or have

---

[12] For the New York deceptive practices claim, the court will apply the New York standard on equitable tolling, which is similar to its federal counterpart. Here, plaintiffs must establish that the defendant "wrongfully deceived or misled the plaintiff in order to conceal a cause of action," and that the failure to initiate the suit in a timely fashion did not result from a lack of diligence. *See Council v. Better Homes Depot, Inc.*, No. 04-CV-5620, 2006 WL 2376831, at *11 (E.D.N.Y. Aug. 16, 2006) (citing *Gleason*, 194 A.D.2d at 764).

become aware of it from the time they conferred with an attorney.  *See Council v. Better Homes Depot, Inc.*, No. 04-CV-5620, 2006 WL 2376831, at *10-11 (E.D.N.Y. Aug. 16, 2006) (citing *Jones v. Ford Motor Credit Co.*, No. 00-CV-8830, 2002 WL 88431, at *5  (S.D.N.Y. Jan. 22, 2002); *Polonetsky v. Better Homes Depot, Inc.*, 760 N.E.1274 (N.Y. 2001)).

The evidence adduced satisfies, for purposes of summary judgment, all three prongs. First, the nature of the scheme alleged by the plaintiffs is inherently self-concealing.  Several courts in cases alleging similar schemes against these same defendants have so concluded.  *See Laboy v. Better Homes Depot, Inc.*, No. 03-CV-4271, 2004 U.S. Dist. LEXIS 30091, at *10-17 (E.D.N.Y. July 16, 2004); *Phillips v. Better Homes Depot, Inc.*, No. 02-CV-1168, 2003 U.S. Dist. LEXIS, at *72-77 (E.D.N.Y. Nov. 12, 2003); *Polonetsky*, 760 N.E.2d at 1277-78.  While that observation alone does not discharge the plaintiffs' obligation to come forward with admissible evidence tending to show concealment, it does help to explain the relative lack of evidence the plaintiffs have pointed to in arguing for equitable tolling.[13]  The plaintiffs, however, do cite sufficient evidence in the record that the Better Homes defendants took affirmative steps to conceal any wrongdoing, such as referring the plaintiffs to two frequently used attorneys (who the plaintiffs contend did not represent their interests), failing to disclose the extent and nature of the relationship between Better Homes and Madison, regularly using the same appraisal

---

[13] The court largely agrees with the defendants that the proof offered by the plaintiffs is frequently less than overwhelming, and not as probative as the plaintiffs assert.  At times, the Rule 56 statements and moving papers make suspect evidentiary showings.  But neither is it the "egregious failure of proof" that the defendants claim.  For example, while the plaintiffs have not submitted affidavits, they are not required to.  *See Celotex*, 477 U.S. at 324.  Likewise, the plaintiffs' citations to the "Wagner Declaration," are not to textual portions based on Wagner's characterizations of the key facts, but to documentary exhibits *attached to* that declaration.  Even though unimpressed with their proof, the court does not agree that the plaintiffs have "completely abdicated [their] burden of citing" concrete, admissible evidence in support of their claims.  *See also supra* note 10.

company and abstract company, having the properties appraised contingent on certain repairs, renovations, certificates or licenses being performed or obtained, and misrepresenting the legal occupancy status for the White and Council properties. *See, e.g.*, *Barkley v. Olympia Mortg. Co.*, No. 04-CV-875, 2007 WL 2437810, at \*16-17 (E.D.N.Y. Aug. 22, 2007) ("The act of employing ostensibly independent legal counsel as part of a predatory lending scam has been held to satisfy the concealment element [for equitable tolling purposes] by several district courts in this circuit.") (citing Judge Garaufis' earlier decision in *Council*). Certainly, it is arguable whether Weinstock and David were "independent," and whether truly independent counsel could have allowed the plaintiffs to discover that the representations made to them by Better Homes were not wholly consistent with the terms of the contract and with the properties more generally. The proof offered by the plaintiffs may well fall short at trial, but it does not entitle the defendants to judgment as a matter of law.

Secondly, it seems from the facts that both cases were brought within the relevant statutory periods after they met with independent counsel and learned of the possibility of bringing this cause of action. White did not meet with Wagner until 2004, after his bankruptcy filing, and he testified that he did not realize the CLA appraisal was inflated until he had conferred with counsel in the instant case in 2004. Nor did he realize or believe he was defrauded until he met with his attorneys in this action. In an affidavit, Kimberly Council stated that she first met with Wagner, in the instant action, in the fall of 2004, and did not learn of this cause of action until that meeting. *See Council*, 2006 WL 2376381, at \*11; *Phillips*, 2003 U.S. Dist. LEXIS 27299, at \*43-44. While the Councils had met with bankruptcy attorneys prior to meeting Wagner, they did not discuss the specifics forming the gravamen of this action. Linda

Council also testified that her attorneys herein brought to her attention what was wrong with the transaction and mortgage, including the alleged discrimination and inflation of the purchase price, and that she did not even realize the discrepancy surrounding the occupancy status until conferring with counsel.[14]  Therefore, both cases – brought in 2004 –  were filed within the statutory periods, which would have started to run in late 2003 or 2004 after the plaintiffs met with Wagner.

Thirdly, nothing indicates a lack of diligence on the part of the plaintiffs, even though there was apparently some level of dissatisfaction with the condition of the homes.  Facts appear to be in dispute as to the plaintiffs' ignorance of the claims.  For example, Council testified that, despite what was in the signed contract of sale, she did not realize she was receiving a legal one-family dwelling until consulting with her attorneys.  It is therefore still very much in dispute whether her ignorance of the cause of action was the result of the defendants' success in employing Weinstock to help conceal material information, or was merely the result of a lack of due diligence.  Moreover, Judge Garaufis already found that "[p]laintiffs' ignorance of their claims during the statutory period is not an obstacle to equitable tolling, where, as here, the

_____

[14] Council also testified that she began to feel the mortgage was too high when the condition of the house started to deteriorate a year after moving in.  Her dissatisfaction with the condition of the home and with the purchase price, however, does not necessarily signify that she learned of the instant causes of action at that time.

wrongdoing is recognized as self-concealing."[15]  *Council*, 2006 WL 2376831, at *9-12 (citing

*Hendrickson Bros.*, 840 F.2d at 1083).

The plaintiffs have the burden of raising genuine issues of material fact as to equitable

tolling, as they are the party seeking to invoke it.  *See Boos v. Runyon*, 201 F.3d 178, 185 (2d

Cir. 2000) (affirming summary dismissal wherein plaintiff failed to raise issue of material fact as

to appropriateness of equitable tolling).  Here, they have adequately, though not

overwhelmingly, met that burden. The determination of whether the applicable limitations

periods should have been equitably tolled is informed by facts that appear to be in dispute.  It

would be difficult to accept the defendants' arguments on equitable tolling without relying on

facts that are still in dispute and have yet to be tried.  This determination requires the sort of fact-

finding that is more the province of the jury than the court.  *See, e.g.*, *Ramirez v. Rifkin*, 568 F.

Supp. 2d 262, 270 (E.D.N.Y. 2007) (denying summary judgment because of "material issues of

fact relating to the propriety of equitable tolling that cannot be resolved on summary

judgment.").

    **D.**    *Caveat Emptor*

---

[15] While Judge Garaufis already denied the defendants' statute of limitation challenges, that determination was at the Rule 12 stage and is not binding on summary judgment.  *See Council*, 2006 WL 2376831, at *9-12; *McAnaney v. Astoria Financial Corp.*, No. 04-CV-1101, 2009 WL 3150430, at *6-7 (S.D.N.Y. Sept. 29, 2009); *Nobel Ins. Co. v. City of New York*, No. 00-CV-1328, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006).  Other courts in similar cases have been skeptical of statute of limitation defenses, and instead have accepted the equitable tolling arguments.  *See, e.g.*, *Barkley*, 2007 WL 2437810, at *16-17; *Laboy*, 2004 U.S. Dist. LEXIS 30091, at *10-17; *Phillips*, 2003 U.S. Dist. LEXIS, at *72-77; *Ford Motor Credit*, 2002 WL 88431, at *5; *but cf. M & T Mortgage Corp. v. Miller*, No. 02-CV-5410, 2009 WL 3806691, at *1-2 (E.D.N.Y. Nov. 13, 2009) (dismissing deceptive practices claim at summary judgment because of failure to file within three-year limitations period).

Lastly before turning to the substantive claims, the Better Homes defendants invoke the doctrine of *caveat emptor* as a defense to the causes of action that White and the Councils have asserted.[16]  With regard to a seller's duty to disclose facts about real property, the defendants cite the "settled law in New York that the seller of real property is under no duty to speak *when the parties deal at arms length*.  The mere silence of the seller, without some act or conduct which deceived the purchaser, does not amount to a concealment that is actionable as a fraud."  *London v. Courduff*, 474 A.D.2d 803, 804 (2d Dep't 1988) (emphasis added and citations omitted).  New York also imposes a duty on buyers of real estate to independently ascertain or verify the value of the property at issue.  *See id.* at 804 (requiring the buyer to "satisfy himself as to the quality of the bargain").

The whole point, however, seems to be that the parties were *not* at arms length, but rather were vulnerable, unsophisticated, first-time home buyers hoodwinked by a sophisticated, layered, business operation involving multiple individuals and entities.  While neither plaintiff performed or procured an independent inspection of the properties prior to the sales, it is entirely plausible that a jury could infer that such a failure resulted from the defendants' having recommended attorneys who did not provide truly independent counsel, and from the defendants' self-representation as a "one-stop shop" that would "take care of everything."  One of the key allegations is that referring buyers to a small cadre of attorneys (whom, it is alleged were actually representing the interests of the defendants) deprived the plaintiffs of the

---

[16] It is not clear from the defendants' moving papers which specific causes of action should be dismissed on summary judgment on the basis of *caveat emptor*.  As a state law doctrine, *caveat emptor* would appear to have little bearing, for example, on the federal discrimination claims under the FHA or the ECOA, since a party cannot sidestep its federal obligations by invoking state law.  *See* U.S. Const. art. VI, § 2.  Since this report recommends rejecting the *caveat emptor* defense, the court does not address whether there is any distinction between state and federal claims in the application of that defense.

independent legal judgment that would have protected their interests and uncovered the defendants' mischief.  Likewise, the practice of using an appraiser in cahoots with the defendants arguably allowed for that tainted, inflated appraisal to determine the purchase price.  Whether or not these allegations are actually true is not for the court to decide here, of course, but there is evidence that would allow for such a finding, and the doctrine of *caveat emptor* is not a license for sellers of real estate to fleece unsuspecting potential buyers or to engage in the conduct alleged in this case.

Notably, other courts have found exceptions to the doctrine of *caveat emptor* when sellers "concealed facts or induced buyers to refrain from making independent inquiries into the terms of the real estate deal."  *Barkley*, 2007 WL 2437810, at *19 (citing cases); *Banks v. Consumer Home Mortgage, Inc.*, No. 01-CV-8508, 2003 U.S. Dist. LEXIS 8230,  at *29-30 (E.D.N.Y. Mar. 28, 2003) (citing cases).  Moreover, in similar cases, courts have been hesitant to accept *caveat emptor* as a defense where "defendants deliberately steered plaintiffs to other members of the conspiracy in order to prevent their discovery of the true value of the properties at issue."  *Barkley,* 2007 WL 2437810, at *19 (citing *Banks*, 2003 U.S. Dist. LEXIS 8230, at *30; *Phillips*, 2003 U.S. Dist. LEXIS 27299, at * 47).  Here, there is evidence that the transactions were structured so that the defendants "thwarted" an independent evaluation of the property by discouraging the plaintiffs from obtaining assistance from members beyond the conspiracy alleged.  *See Banks*, 2003 U.S. Dist. LEXIS 8230, at *30.  Linda Council, for example, was informed by the defendants that "everything had been taken care of," that Weinstock had her best interests at heart, and that everything had been "laid out" for them.  She also testified of being told by Better Homes that "everything," including the provision of the

mortgage, was included in the "package" that BHD was offering, and that because it was like "one-stop shopping," "everything had been taken care of" and all that Council needed to do was sign the papers.  Better Homes had similarly represented to White that "everything would be done through them," that they would appraise the property, and that everything would be "taken care of" by them, while White also testified that David had told him that he had read the paperwork and that everything was "okay" and "legitimate."  The probative, admissible evidence, while hardly overwhelming, could permit a jury to infer that the plaintiffs' central allegations on concealment are true.

Lastly, the essence of the claims is not that White or the Councils were sold a *lemon* of a dwelling or only that the houses contained material defects that the sellers failed to disclose.  The deceptions allegedly involved go beyond the "mere silence" of Better Homes to something much more invidious, including a systematically fraudulent and discriminatory scheme.  The condition of the homes themselves is not necessarily at the heart of this lawsuit, as the allegations are not limited, for example, to the poor functioning of the plumbing or electrical systems.  *See, e.g.*, *Ercole v. McGay*, 831 N.Y.S. 2d 359 (Table), 2006 WL 3490419 (N.Y. Sup. Ct. App. Term Nov. 29, 2006).  Even were that the case, Linda Council testified at her deposition that Better Homes had affirmatively represented to her, prior to the sale, that repairs would be performed before she moved in or thereafter, and that everything would be in working order to make the house livable.  There is also extensive deposition testimony on different problems the Councils and White encountered with respect to the poor condition of their homes and the work that had been performed.  Those representations, which extend beyond mere silence or failure to disclose, are thus contradicted by evidence in the record, and since much is still in dispute, a rational trier of

fact could certainly find differently. This is more than a case of *buyer beware*, and *caveat emptor* should not entitle the defendants to a grant of summary judgment in their favor.

### E.     The Individual Claims

The crux of the allegations is that BHD represented to the plaintiffs that they would be buying a four-family (White) and two-family (the Councils) dwelling, and that all repairs, renovations, and necessary improvements would be performed so that the homes would legally carry those classifications and the plaintiffs would be able to realize legal rental income to help make the mortgage payments. Because the appraisals were contingent on such work being performed and the purchase price essentially matched the appraisal price, the plaintiffs contend that they were defrauded into paying a higher purchase price than they would have otherwise paid, and that referring them to particular lawyers and using the same parties and appraisers in similar transactions allowed the defendants to execute and carry on this scheme. Because the mortgages were insured by the FHA, Madison could originate the loans and then sell them with little risk; MHE was thus largely insulated from the negative effects of the borrower's default or inability to make payments. The defendants have moved for summary judgment on the discrimination claims under the FHA and the ECOA, and on the fraud, conspiracy, and deceptive practices claims, contending that the plaintiffs cannot establish a *prima facie* case for any of those causes of action.[17] The plaintiffs have cross-moved for summary judgment on the fraud claim, the deceptive business practices claims, and the conspiracy claim with respect to Eric

---

[17] The Council defendants have moved for summary judgment on a claim under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* The plaintiffs oppose that aspect of the defendants' motion. The court has reviewed the Council complaint, however, and finds that no TILA claim alleging non-disclosure of certain terms was ever brought. Therefore, the court does not have occasion to consider the substance of the parties' TILA arguments. *Cf. Phillips*, 2003 U.S. Dist. LEXIS 27299, at *77 (dismissing TILA claims not brought against moving defendants).

Fessler, Better Homes Depot, Nadine Malone, Michael Ridenow (on the conspiracy claim only) and Madison Home Equities. Additionally, they have moved for summary judgment with respect to the ECOA claim against Malone and MHE.

### 1. Fraud, Deceptive Practices, and Conspiracy

#### a. *Fraud*

The elements of fraud under New York law are met by showing (1) a misrepresentation or omission of material fact; (2) made deliberately or knowingly (with *scienter*); (3) with the intent to defraud; (4) reasonable reliance on the representation; and (5) pecuniary damages or loss. *Herzfeld v. JPMorgan Chase Bank, N.A.*, No. 09-0213-CV, 2009 WL 4072083, at *1 (2d Cir. Nov. 25, 2009) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)); *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citations omitted). Each element must be proven at all stages, including at summary judgment, by clear and convincing evidence. *See, e.g.*, *Hilton Hotels Corp.*, 528 F. Supp. 2d at 219 (citing cases and discussing the standard in greater detail).

Although couched as a motion for summary judgment, BHD's first argument on the fraud claim attacks the sufficiency of the complaints for failing to comply with heightened pleading standards for alleging fraud. Therefore, the court will first address this argument even though it does not implicate a failure of proof at the summary judgment stage. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Pro. 9(b). A complaint must "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend

the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)); *see also Goldman v. Belden*, 754 F.2d 1059, 1069-70 (2d Cir. 1985). That said, it is "sufficient under Rule 9(b) if plaintiffs provide an adequate basis for their allegations and give defendants enough information to put them on notice of the nature of the claim. Rule 9(b)'s requirements may be relaxed as to matters particularly within the opposing party's knowledge." *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987) (citing *Credit & Finance Corp. Ltd. v. Warner & Swasey Company*, 638 F.2d 563, 566-67 (2d Cir. 1981)); *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1135-36 (S.D.N.Y. 1996); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1089-90 (S.D.N.Y. 1994), *aff'd sub nom. Tribune Co. v. Abiola*, 66 F.3d 12 (2d Cir. 1995).

Here, the defendants were given enough information to put them on adequate notice of the plaintiffs' claims. The allegations in the complaint relate to specific representations made by a limited group of people over a relatively short period of time on a particular and definite subject matter. The defendants have been given sufficiently specific information with which they are able to mount a vigorous defense and counter the plaintiffs' allegations and proof. *See Glickman v. Alexander & Alexander Servs., Inc.*, No. 93-CV-7594, 1996 U.S. Dist. LEXIS 2325, at *13 (S.D.N.Y. Feb. 29, 1996). Additionally, the allegations surrounding the fraud are fairly clearly within the defendants' knowledge. Of course, Rule 9(b)'s requirements should not be dispensed with altogether, but the court is satisfied that the fraud claims have been alleged with sufficient particularity. Moreover with respect to the heightened pleading standards, at least some of the material misrepresentations or misstatements appear to be in writings produced by

the defendants, such as the appraisals and (for White), the contract of sale. In such circumstances, it is not hard to identify where and when the statements were made, and generally by whom.

Contrary to BHD's protestations, the fraud claim does not merely allege that White and the Councils did not receive what they were contractually entitled to receive. In other words, that the BHD defendants, with the same underlying conduct, may have *also* breached contracts does not signify that they may not, as a matter of law, be liable for fraud. *See, e.g.*, *Rosen v. Spanierman*, 894 F.2d 28, 35 (2d Cir. 1990); *Auerbach v. Amir*, No. 06-CV-4821, 2008 WL 479361, at *5-7 (E.D.N.Y. Feb. 19, 2008) (distinguishing between breach of contract and fraudulent inducement claims). Moreover, since the plaintiffs are not asserting a breach of contract claim, allowing the fraud claim to proceed does not risk the duplication that courts were concerned could result from pleading breach of contract together with fraud. *See Auerbach*, 2008 WL 479361, at *5-7 (citing cases). Rather, in broad strokes, the claim asserts that, by virtue of false promises, representations, and omissions, the plaintiffs were systematically defrauded into buying the properties and paying and borrowing more than they should have both for the purchase and for subsequent repairs or conversions.

**b.      *Material Misstatements or Omissions***

There is ample evidence, in the contract of sale, the rider, the appraisal, and elsewhere, that Better Homes represented to White that he could *legally* rent out the four units in his home, or as he wished, live in one himself and rent out the other three. Likewise, because of the lack of a valid CO for use as a four-family dwelling, it appears in dispute whether White may legally rent those units. While the White house was constructed prior to the issuance of certificates of

occupancy (beginning in 1968), it is also in dispute whether a certificate of occupancy was legally required for White's dwelling. Under New York City's Administrative Code, houses that require COs include not only those *erected* since 1968, but those that have been *altered* since 1968. *See* N.Y.C.A.C. § 26-222. Evidence regarding alterations since 1968 at both 164 Macon Street and 102 Etna Street would thus appear to be material and in dispute. While there is evidence regarding certain cosmetic repairs and renovations on both properties, it is not clear, at least to the court, whether that work constitutes *alteration* as that term is used in the Administrative Code. Certainly there is evidence that despite the contract's terms, BHD made numerous representations to the Councils that 102 Etna Street was a two-family home. Council testified that in her dealings with Lewis and BHD, she had been "assured from day one that [she] would get a two-family house," while the house was appraised as a two-family dwelling. There is also evidence that the basement was renovated in such a perfunctory manner so that the property cannot legally carry two-family occupancy status, even apart from the fact that it did not have a valid certificate of occupancy making it a two-family dwelling. Thus, the discrepancies and inconsistencies between what was promised and what was received in both cases, raise genuine issues of material fact regarding the need for certificates of occupancy, and the occupancy status more broadly.

With respect to occupancy status, the BHD defense appears to be that whether or not the premises is a legal four-family dwelling, White has been *using* and occupying the premises as a four-family dwelling, and has been deriving significant rental income from the other units in the home. White's use of the home, however, does not mean that it is in fact and in law, a legal four-family dwelling, which is what BHD represented he would be receiving in the contract of

sale and on the basis of prior statements.  Therefore, BHD's argument seems better placed to address damages or actual injury, rather than whether BHD's representations as to occupancy can be a material misstatement for purposes of a fraud claim.  Since injury is a necessary element to a proper fraud claim, material issues of fact remain to be determined with respect to that element.  The court also does not accept BHD's subsidiary position that White should be estopped from making these claims, or that his right to bring them has been waived by renting out the units in his house.

The defendants' valuation of the houses in the respective appraisals could also serve as a material misrepresentation of existing fact because of BHD's purported knowledge of falsity with respect to the legal occupancy status, and BHD's alleged false undertaking or agreement to perform the necessary repairs, renovations, or conversions.  *See generally Simms v. Biondo*, 816 F. Supp. 814, 819-21 (E.D.N.Y. 1993) (citing cases showing exceptions to the rule that statements of value are not actionable as fraud).  That market value, allegedly inflated on the basis of those two false assumptions, is generally considered opinion and therefore not as demonstrably false as other possible misrepresentations, does not mean that statements of value cannot serve as the basis for a fraud claim.  *See Phillips*, 2003 U.S. Dist. LEXIS 27299, at *34-36.  While statements of value may be opinion in some respect (and in real estate transactions be subject to the doctrine of *caveat emptor  – see id.*), when sellers "actively induce[] a purchaser to forbear from investigating the value for themselves or otherwise dupe[] the purchaser through exceptional enough facts, courts will ignore this general rule and hold the seller responsible for his or her misstatements as fraud."  *Id.,* 2003 U.S. Dist. LEXIS 27299, at *35-36 (citing cases). The same is true when sellers "concealed facts or induced buyers to refrain from making

independent inquiries into the terms of a real estate deal." *Barkley*, 2007 WL 2437810, at *19.

Along these lines, when the appraisal value is (1) based on information that the defendant knows

to be untrue – here, the legal occupancy status and the need for substantial renovation – and (2)

is determined in the larger context of the overall fraud scheme alleged (especially concerning the

attorneys), such representations go beyond mere opinion and become actionable as part of a

fraud claim because of the intent to deceive. *See Wilson v. Toussie*, 260 F. Supp. 2d 530, 540

(E.D.N.Y. 2003) (citing *Simms*, 816 F. Supp. at 820) (probing whether the misstatements as to

value are made "in conjunction with a larger scheme or conspiracy to defraud"). In particular,

there is evidence that tends to "show[] a[] scheme or deception by the [defendants] designed to

trick the Buyers about the value of the [property at issue]." *Simms*, 816 F. Supp. at 820.

Because there are still material facts in dispute about that larger scheme, and about the fair value

of the homes at the times they were sold and the representations underlying the appraisals,

summary judgment is not warranted.

     The fraud claim could also be predicated upon BHD's material misrepresentations as to

whether the properties would be substantially repaired and renovated. It is not controversial that

"a representation of the maker's intention to do or not to do a particular thing is fraudulent if he

does not have that intention." RESTATEMENT (SECOND) OF TORTS § 530(1). Therefore, a

promise by the defendant without the intention to actually perform it, can serve as the material

misstatement giving rise to a fraud claim. *See Hilton Hotels Corp.*, 528 F. Supp. 2d at 221;

*Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) ("[I]f a promise was actually made

with a preconceived and undisclosed intention of not performing it, it constitutes a

misrepresentation of material existing fact[.]") (quoting *Sabo*, 143 N.E.2d 906, 908 (N.Y.

1957)); *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to

perform future acts is not ground for a fraud action unless there existed an intent not to perform

at the time the promise was made."); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151

N.E.2d 833 (N.Y. 1958). "A present expression of the intent to perform a future act is actionable

as fraud only if 'actually made with a preconceived and undisclosed intention of not performing

it.'" *Tanzman v. La Pietra*, 8 A.D. 3d 706, 708 (3d Dep't 2004) (quoting *Sabo*, 143 N.E.2d at

908). Linda Council testified she was told there would be no "major work" and no major issues

with respect to the condition of the home. Everything that was not completed when she moved

in, she was told, would be completed thereafter, and Better Homes would "repair everything that

wasn't working properly to make sure that it was livable and comfortable." Council's recitation

of the problems incurred – *see supra* note 5 – raises genuine issues as to whether these

representations rise to the level of being materially false. The overall habitability of the

basement also appears to be in dispute. While there may be some flexibility with which it could

be argued whether and how the promised repairs were actually made to both houses, it would

seem to be the jury's role to determine whether those representations were material and whether

they were false.

There is a strong basis to conclude that the defendants concealed from the plaintiffs the

poor, dilapidated condition of both houses, and the extent of the repairs and renovations that

were needed so that the houses would approximate the values ascribed to them in the appraisal.

By using lenders, attorneys, and appraisers chosen or recommended by the defendants (even

though BHD never represented that the plaintiffs were not free to use parties of their choosing),

it is reasonable to see how the defendants were able to conceal the true condition of the houses

and how that condition related to and informed the appraisal.  *See, e.g.*, *Phillips*, 2003 U.S. Dist. LEXIS 27299, at *45-49 (quoting 60A N.Y. Jur. 2d Fraud and Deceit § 158).  For example, while White or the Councils *could* have engaged an independent inspection and appraisal, it is reasonable to infer that recommending or employing Weinstock, David, MHE, or CLA, prevented them from using that opportunity.  That all this still appears in dispute is a sound basis on which to deny all parties' summary judgment motions on the fraud claim.[18]

### c.  *Knowledge of Falsity*

Knowledge of falsity could easily be inferred from using David and Weinstock to shepherd the plaintiffs through their respective closings without discovering that BHD's representations or omissions were false and misleading.  It can also be argued that in promising to White and the Councils that all necessary repairs and renovations would be performed, the defendants must have known that was false – if it is proved to be false –  since they did not intend to undertake such repairs or intended to perform them in so roughshod a manner such that the promise could rise to the level of being materially false.  BHD's representations to Linda

---

[18] It is somewhat regrettable that the plaintiffs' claims regarding the defendants' verbal representations are often not supported by citations to admissible evidence.  For example, the plaintiffs repeatedly cite to the written Council appraisal to substantiate what they claim BHD verbally represented to them.  However, in the context of this case, the relative paucity of evidence regarding BHD's verbal representations is not as egregious as the defendants suggest.  Although the plaintiffs could have submitted affidavits attesting to the defendants' representations to induce the purchase and mortgage, neither Rule 56 nor the case law require affidavits.  *See* Fed. R. Civ. Pro. 56(e) (requiring non-movant's facts to be submitted by "affidavits *or as otherwise provided for in this rule*") (court's emphasis); *Celotex*, 477 U.S. at 324.  The court may rely on the sworn complaints if the plaintiffs base their allegations (what they were told) on personal knowledge, and not just on information and belief.  *See Patterson*, 375 F.3d at 219; *Fitzgerald*, 251 F.3d at 361.  Indeed, the complaints offer a far more detailed, extensive picture of the defendants' representations on the occupancy status, rental possibilities, necessary renovations, and value of the home, than does the evidence the plaintiffs have cited in opposing the defendants' motion and arguing their own summary judgment motions.  Therefore, White's complaint (the *Council* complaint does not appear to have been signed by the plaintiffs and is not a verified pleading) is not without value to the court at the summary judgment stage, particularly as to the more specific, concrete representations alleged.  *See also supra* notes 10 & 13.

Council that the premises at 102 Etna Street was a two-family home are also belied by the terms of the contract stating it is actually a one-family dwelling. Similarly, knowledge that the houses did not have the requisite certificates of occupancy could be quite probative that BHD knew that the homes were not legal four-family and legal two-family dwellings. Using Weinstock and David to prod the plaintiffs to sign the necessary documents shows that they either (i) were not aware of the representations that the defendants made regarding the properties, and thus made no effort to make themselves informed and ensure that the contract of sale incorporated those promises, or (ii) were aware of BHD's representations and consciously allowed them to be scrubbed from the face of the contract. Either way, it is arguable that the plaintiffs' interests were not fully and robustly protected, and there is evidence that BHD and the other defendants facilitated such a failure. Both situations would show knowledge of falsity on the part of the defendants. In short, there is ample evidence with regard to this element of the fraud claim, but there is also much still in dispute, thus entitling no party to judgment as a matter of law.

> ### d.       *Intent to Deceive*

Intent to defraud can be generally shown by evidence of "guilty knowledge or willful ignorance." *Hilton Hotels Corp.*, 528 F. Supp. 2d at 222 (citations omitted); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Courts will somewhat relax the proof required here, and allow parties to resort to circumstantial evidence and legitimate inferences therefrom, as there is usually not direct evidence of fraudulent intent. *See Hilton Hotels Corp.*, 528 F. Supp. 2d at 222 (citing cases). The "strong inference of fraudulent intent" may be shown by evidence of the defendants' motive and opportunity to commit fraud or "conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting *Shields*,

25 F.3d at 1128). Thus, the preceding discussion on BHD's knowledge of the falsity of their representations is useful here as well, and allows for a strong inference of the requisite fraudulent intent. Especially with regard to the intent element, the plaintiffs repeatedly invoke the spoliation sanction and admissions during discovery, and repeatedly point to the court's prior order authorizing an adverse inference jury instruction and precluding certain documentary evidence regarding sales of other properties. However, it is difficult to see how that instruction and preclusion, coupled with the evidence and unopposed facts that the plaintiffs have marshaled, would warrant an order granting summary judgment in their favor. The court is cautious to infer too much from the spoliation sanction alone. Contrary to the plaintiffs' implicit argument, the adverse inference instruction and preclusion sanction does not mean that evidence cannot or will not be presented as to Better Homes' repairs or renovations on the *plaintiffs'* properties. In other words, that (i) a jury would be given the adverse inference instruction and (ii) that the defendants are precluded from offering certain documentation of repairs and renovations to other properties, hardly means that no genuine issue of material fact remains. It is entirely conceivable that the evidence at trial could favor the defendants and that a jury could give little weight to the adverse inferences they are entitled or allowed to draw. While the spoliation sanction certainly redounds in the plaintiffs' favor, it is not the *coup de grâce* of this litigation that they hold it out to be.

The plaintiffs also argue that evidence of BHD's intent to defraud can be inferred from the sale of 50 different 2-4 family homes (containing rental units) between January 1999 and May 2000, wherein Better Homes was the seller, Madison was the lender, and the loans were

insured by the FHA.  They contend that the recurrence of similar parties and terms,[19] and the lack

of construction, alteration, or repair Riders – perhaps contradicting Fessler's deposition

testimony that BHD would routinely spend thousands of dollars in making needed repairs to the

houses prior to the sales – suggest a larger scheme to defraud.  Additionally, the plaintiffs point

to evidence of the deed alteration scheme in 96 other BHD sales, arguing that in conjunction

with the prior admissions, preclusion, and inference instructions, this evidence shows, under

Federal Rule of Evidence 404(b),[20] a pattern or "common scheme or plan" probative of the

defendants' intent to defraud.

Resort to evidence involving the deed alterations in the 96 other property transactions

does seem to brush up against, and perhaps oversteps, the outer limits of Rule 404(b).  For

example, the deed alterations arguably show unscrupulous, unsavory practices on BHD's part,

but it is not abundantly clear how they relate to the fraud alleged in these cases.[21]  Rather, the

_____

[19] Of the 50 comparable transactions, CLA was the appraiser for 49, the Ackerman firm represented BHD and MHE in all 50, Paragon was the abstract company in 46, Zucker was the title closer in all 50, and the sales prices generally matched the appraisal prices.  Of the 36 files that identify the buyers' attorney, Weinstock or David appeared in 13 of them.  Additionally, approximately 90% of the home buyers were minorities.  Lastly, the appraisals also value the homes "subject to satisfactory completions, repairs, or alterations," while the contracts of sale also state that the properties are being sold "as is," without Riders detailing the work needed to be done.

[20] Under Rule 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge . . ."

[21] The plaintiffs assert that the closing files for the Fusco (represented by David) and Allen/Saeed (represented by Weinstock) transactions, attached to the plaintiffs' moving papers as Exhibits X and Y, evince similar promises of substantial repairs and renovations made to those purchasers as well as deed or title problems, but the court does not see how those documents reflect BHD's representations that it would undertake substantial repairs.  Additionally, the Jean-Jacques complaint, annexed as Exhibit Z, does make some similar allegations, but even though it states it is a verified pleading, the papers submitted to the court do not include Jean-Jacques' signature or attestation as to the truth of the allegations.  It is therefore of limited value.  That said, both Fusco and Jean-Jacques are listed as non-party witnesses, and the court is able to draw an inference that their trial testimony will be highly similar

plaintiffs' argument seems to be that BHD's use of such unscrupulous, unsavory practices makes it more likely that they would have engaged in the suspect practices alleged in this case. That, of course, is not an appropriate purpose for offering evidence of other bad acts under Rule 404(b). And with respect to the 50 comparable sales, the documents themselves do not demonstrate that fraudulent conduct or false promises were involved – though it might be possible to infer that those buyers received assurances similar to those alleged herein. Although the evidence above concerning other transactions might be admitted to prove fraudulent intent, it does not furnish a reason to grant BHD's motion. On the contrary, the range in permissible inferences that might be drawn demonstrates that summary judgment is not an appropriate disposition of the matter. Taking into account the entire evidentiary record, and drawing all legitimate inferences and viewing the evidence in favor of the non-movant, it is clear that material factual issues have not yet been resolved with respect to the defendants' intent to defraud.

e. *Reasonable Reliance*

Plaintiffs must demonstrate not only that they relied on the misstatements or misrepresentations, but that such reliance was both justifiable and reasonable. *See Hilton Hotels Corp.*, 528 F. Supp. 2d at 228 (quoting *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 419 (S.D.N.Y. 1992)). They must be justified both in believing the misstatement and in acting on it. *See id.* That said, justifiable reliance is also assessed in the larger context of the case and the questions raised. *See Crigger*, 443 F.3d at 235 (considering the "entire context of the transaction"); *Toussie*, 260 F. Supp. 2d at 540. In

_____

to the allegations in the instant cases. For purposes of summary judgment, however, the references to the Fusco, Allen, and Jean-Jacques transactions – and more broadly, to the non-party transactions – are not terribly probative of intent to defraud.

particular, the court notes the law's "indulgen[ce] of the simple or untutored" in placing less of a burden [for reasonable reliance purposes] on unsophisticated parties. *Crigger*, 443 F.3d at 235. Still, the reliance must be reasonable.

In another case against Better Homes and Madison, Judge Korman concluded that "[i]f a jury finds that defendants intentionally steered [the plaintiff] to a lawyer, convinced her to trust them and that lawyer, and consciously led her down a false path of trust so as to profit from her ignorance, that is sufficient to establish reasonable reliance." *Phillips*, 2003 U.S. Dist. LEXIS 27299, at *47. A jury could – or could not – rationally make such a finding based on the evidence brought forward in both cases herein. For example, Linda Council testified she was comfortable proceeding with the purchase because she believed Better Homes would be fair with her and would have her best interests at heart, since Weinstock assured them on the price of the home, and that everything was "honest and aboveboard" and "by the book" because of HUD's involvement.[22] Her deposition is peppered with similar statements, and Council testified that she only "briefly" read or "glanced" at the numerous closing documents that required her signature because she "trusted" Weinstock and Better Homes, and "didn't feel that [she] had to read them, because [Weinstock] told [her] that everything was fine, that [she] just sign them, that it was just standard operational procedures." Judge Glasser observed in *Vaughn v. Consumer Home Mortg., Inc.* that "[r]elying upon [the defendant's] representations that the documents were 'standard,' that there was 'no problem' and that they should just 'sign it here,' the plaintiffs signed the papers put before them without knowing what they were signing." No. 01-CV-7937,

---

[22] Council later testified that she did not specifically recall whether Weinstock ever told her that $209,000 was a fair price for the house.

2003 U.S. Dist. LEXIS 8233, at *7 (E.D.N.Y. Mar. 27, 2003). With this set of facts, he found

reasonable reliance because the defendants "deliberately steered plaintiffs toward other members

of the conspiracy in order to thwart an independent evaluation of the property." *Banks*, 2003

U.S. Dist. Lexis 8230, at *30. The proof offered in the instant cases raises at least the inference

of conduct and practices too similar to that alleged in *Phillips*, *Vaughn*, and *Banks*, and *Barkley*

as well – *see Barkley*, 2007 WL 2437810, at * 1-3, 19 – to warrant a different finding regarding

reasonable reliance.

      This conclusion is bolstered by the principles found in the court's discussion of BHD's

*caveat emptor* defense. While *caveat emptor* does place an obligation on buyers of real estate to

investigate the property and its value that might appear to preclude reliance on the defendants'

misrepresentations, in the specific circumstances of this case, *caveat emptor* should not hold

sway for the reasons provided in that discussion *supra*. And while the language of Paragraph 12

of the contract of sale would, if taken literally, appear to preclude the plaintiffs from establishing

reliance, the circumstances surrounding the signing of the contracts and the attorneys' roles and

representations, raise genuine issues of material fact as to whether the plaintiffs fully understood

the meaning of those terms and consented to them. For example, even though the Council

contract (indicating that 102 Etna is a one-family house) contained standard merger language

disclaiming prior representations, Weinstock's disputed role in the allegedly fraudulent

transaction calls into question whether that written representation supersedes the prior

representation that it was a two-family house. Indeed, Linda Council testified that

notwithstanding the terms of the contract, she was under the impression that her house was a

two-family dwelling until alerted otherwise by the Buildings Department summons and her

attorneys. Additionally, in the purchase of real estate, buyers ought to be able to justifiably rely on their counsel, and there is ample evidence that White and Council proceeded in at least partial reliance on their beliefs that "everything was okay" and "legitimate" and that their attorneys were protecting their best interests.[23] Likewise, despite the "as is" language of Paragraph 12, the merger clause is general and boilerplate, and does not relate to any specific representations made. In such circumstances, it should not preclude reasonable reliance. *See Hilton Hotels Corp.*, 528 F. Supp. 2d at 229.

### f. Damages or Injury

The plaintiffs have submitted estimates of the repairs or renovations necessary in order to convert the homes to legal four-family and two-family dwellings, and what it would cost to obtain valid certificates of occupancy. There is also extensive deposition testimony on the myriad problems that have occurred with the houses (more so with the Council property), and the expenses the plaintiffs have incurred in trying to address and fix them. Lastly, triable issues of fact remain with respect to the valuation of the houses in the appraisal, and what they should have been appraised at based on the actual occupancy status, the need for repairs, and the availability of legal rental revenue. The true market value of the homes at the time they were sold appears to still be in dispute. Because the appraisals informed the sales price, which in turn dictated the amount of the mortgage, the amounts the plaintiffs have been paying – or in some instances, not paying – for the mortgages could reasonably be found to be greater than what they should have been. *See Banks*, 2003 U.S. Dist. LEXIS 8230, at *31-32. As these estimates are

---

[23] Of course, the reliance should be on the misstatements themselves and not on the plaintiffs' belief in the honesty and independence of their attorneys. Still, it appears that the misrepresentations herein extend to the reliance on David and Weinstock such that the two issues are inextricably bound, and in the context of this case and the overall scheme alleged, this distinction may not be material.

highly disputed by the defendants, material factual issues remain with respect to damages and how the plaintiffs were injured by the alleged fraud.[24]

### g.    Conspiracy and Aiding and Abetting

Given the nature of this case and these allegations, the plaintiffs' claim that the defendants conspired to commit fraud should live or die with the underlying fraud claim. This is especially true because the fraud depended on the existence of an alleged conspiracy. In other words, the species of fraud alleged by the plaintiffs required, by nature, the participation and concert of many different entities, including Better Homes, Madison, and their principals, as well as the attorneys and appraiser. For the conspiracy claim to proceed, the plaintiffs must allege the elements of fraud – discussed *supra* – as well as (1) "a corrupt agreement between two or more persons; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in furtherance of the plan or purpose; and (4) the resulting damage or injury." *777388 Ontario Ltd. v. Lencore Acoustics Corp.*, 142 F. Supp. 2d 309, 319 (E.D.N.Y. 2001) (quoting *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991); *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986)). For the reasons expressed in the foregoing discussion of fraud, there is enough evidence in the record to establish or rationally infer the four

---

[24] The plaintiffs' apparent inability, upon being deposed, to verbally articulate the legal bases and contours of their fraud claims does not signify that the claims they assert lack a basis in law and fact. It is, in part, for that very reason that they obtained counsel. Obtaining legal representation ensures that whatever grievances a plaintiff has can be articulated into an actionable claim. The plaintiffs' inelegance at their depositions in describing their claims and the damages they seek is not as probative as the defendants suggest, which is not to say that it is completely irrelevant to the plaintiffs' ability to successfully prosecute those claims. It also tends to lend credence to the belief that they were unsophisticated parties who were easily misled. For the reasons stated, however, no party has made an adequate showing that he or she (or it) is entitled to summary judgment on the fraud claims.

elements of conspiracy required under New York law. As with the fraud claim, material issues of fact remain; summary judgment is thus an inappropriate disposition of this cause of action.

The plaintiffs have brought an additional fraud-related cause of action, charging that "the private defendants" aided and abetted the co-defendant principals in commission of the fraud. The court is unsure who exactly this claim is asserted against, as the identity and meaning of the "private defendants" is not clear. Regardless, the defendants put forward a perfunctory argument that because they should be entitled to judgment as a matter of law on the underlying fraud claim, the aiding and abetting claim must be dismissed as well. That would be the case if the fraud claim were dismissed on summary judgment, but as the court recommends allowing that claim to proceed, and since the plaintiffs have asserted the aiding and abetting claim as a separate cause of action, some discussion is necessary. This claim requires the plaintiffs to show "(1) the existence of the primary fraud, (2) the aider and abettor's knowledge of the fraud, and (3) substantial assistance by the aider and abettor." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 488 (S.D.N.Y. 2001), *amended in part on reconsideration*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001). For the same reasons as with the conspiracy cause of action, material issues of fact remain with respect to the defendants' knowledge of the fraud, and whether they provided "substantial assistance." Therefore, the court recommends denying the motion for summary dismissal of the aiding and abetting claim.

### h.    Deceptive Practices under N.Y. Gen. Bus. Law § 349

Deceptive conduct that does not rise to the level of actionable fraud may also form the basis of a claim under New York's Deceptive Practices Act, which protects consumers from conduct that might not be fraudulent as a matter of law, and relaxes the heightened standards

required for a fraud claim. *See* N.Y. Gen. Bus. Law § 349; *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 542 (E.D.N.Y. 2006); *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002); *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 445 (S.D.N.Y. 2005); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198, 231-32 (E.D.N.Y. 2001), *rev'd in part on other grounds*, 344 F.3d 211 (2d Cir. 2003). In that vein, a Section 349 claim need not include proof of intent to deceive, *scienter*, or justifiable reliance. *See Pettit v. Celebrity Cruises*, 153 F. Supp. 2d 240, 265 (S.D.N.Y. 2001). Section 349 broadly makes it unlawful to engage in "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. Gen. Bus. Law § 349(a). The Act provides a cause of action to "any person who has been injured by reason of any violation of this section" and provides for recovery of actual damages. N.Y. Gen. Bus. Law § 349(h). Harmed consumers must establish (1) a "consumer-oriented" practice that was (2) materially misleading or deceptive, and (3) that the plaintiff suffered a resulting injury. *See Champion Home Builders Co. v. ADT Sec. Servs., Inc.*, 179 F. Supp. 2d 16, 27 (N.D.N.Y. 2001). Determining whether the practice is materially misleading is an objective exercise, and requires a showing that the "reasonable consumer would have been misled by the defendant's conduct." *Berrios v. Sprint Corp.*, No. 97-CV-0081, 1998 WL 199842, at *3 (E.D.N.Y. Mar. 16, 1998) (quoting *S.Q.K.F.C. Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996)).

A threshold question exists as to whether or not the practice complained of is consumer-oriented. *See Lava Trading Inc. v. Hartford Fire Ins. Co.*, 326 F. Supp. 2d 434, 438 (S.D.N.Y. 2004); *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995). To provide

the basis for a Section 349 claim, a disputed private transaction must have "ramifications for the public at large," or be harmful to the general public interest. *See Exxonmobil Inter-America, Inc. v. Advanced Information Engineering Services, Inc.*, 328 F. Supp. 2d 443, 447-49 (S.D.N.Y. 2004); *Boule v. Hutton*, 320 F. Supp. 2d 132, 137-38 (S.D.N.Y. 2004); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741 (N.Y. 1995). "The conduct need not be repetitive or recurring but defendant's acts or practices must have a broad impact on consumers at large; 'private contract disputes unique to the parties would not fall within the ambit of the statute.'" *New York Univ.*, 662 N.E.2d at 770 (quoting *Oswego Laborers'*, 647 N.E.2d at 744).

The court is not willing to find as a matter of law that a purchase of a home and accompanying mortgage cannot be harmful to the public interest generally and therefore cannot be sufficiently "consumer-oriented" to comply with the statute. That position is not fully consistent with the case law. *See, e.g.*, *Oswego Laborers'*, 647 N.E.2d at 745 (denying summary judgment on Section 349 claim wherein "defendant bank dealt with plaintiffs' representative as any customer entering the bank" and furnished standard forms and advice as it would with any member of consuming public); *Exxonmobil*, 328 F. Supp. 2d at 449 (Section 349 liability "attaches primarily where a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers."); *Gaidon v. Guardian Life Ins. Co. of America*, 725 N.E.2d 598, 603 (N.Y. 1999); *but cf. Canario v. Gunn*, 300 A.D.2d 332, 333 (2d Dep't 2002) (affirming dismissal of Section 349 claim wherein the "misrepresentation had the potential to affect only a single real estate transaction involving a single unique piece of property."); *Banc of Am. Commercial Fin. Corp. v. Issacharoff*, 728 N.Y.S.2d 861, 867-68 (N.Y.

Sup. Ct. 2000) (dismissing borrower's Section 349 affirmative defense and counterclaim in foreclosure action because bank's conduct was "particular to [borrower] and not a type of standard practice" and was a "private contract unique to the[] parties").  The transactions herein were "not unique to the parties, nor [were they] private in nature or a 'single shot transaction.'" *Oswego Laborers'*, 647 N.E.2d at 745 (quoting *Genesco Entertainment v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984)).  On the contrary, such practice could easily recur and could "potentially impact similarly situated consumers" and therefore be considered consumer-oriented and harmful to the public at large.  *Oswego Laborers*, 647 N.E.2d at 745.  While the deceptive practices were aimed at particular individuals in these instances, nothing suggests that similarly vulnerable consumers could not – and did not – fall victim to similar practices, and there is nothing especially unique or unusual about these particular transactions.  In addition, other conduct in connection with the provision of loans and mortgages has also fallen within the ambit of Section 349.  *See, e.g.*, *Moses v. Citicorp. Mortg.*, *Inc.*, 982 F. Supp. 897, 903 (E.D.N.Y. 1997); *Barkley*, 2007 WL 2437810, at *18; *Banks*, 2003 WL 21251584, at *7, 12 (declaring it "well settled that Section 349 covers real estate transactions"); *Negrin v. Norwest Mortg., Inc.*, 263 A.D.2d 39 (2d Dep't 1999).  Moreover, the disparity in bargaining power favors a finding of consumer-oriented practice, as the statute was intended to protect "small-time individual consumers" and not sophisticated commercial entities.  *See Exxonmobil*, 327 F. Supp. 2d at 449 (citing *Genesco*, 593 F. Supp. at 751-52).

There is evidence in the record that the defendants represented themselves to the plaintiffs as a "package" service and as a "one-stop shop."  In a case involving essentially the same conduct as that alleged herein, brought by the City Department of Consumer Affairs

against BHD and Fessler under New York City's analogous but narrower consumer-protection statute, the Court of Appeals held that a "package of services . . . offered in the context of a real-estate transaction" was sufficiently consumer-oriented. *Polonetsky*, 760 N.E.2d at 1277. There, the deceptive conduct at issue was consumer-oriented where the defendants

> not only sold property, but allegedly orchestrated a system of providing services under which prospective buyers were defrauded or misled every step along the way [and] promoted overpriced homes, promising, but often failing, to repair the properties. When buyers expressed concern about paying too much, Better Homes indicated falsely that FHA involvement with the transaction would guarantee buyer satisfaction. Further, defendants allegedly steered buyers to mortgage bankers and attorneys who had connections to Better Homes, making it unlikely that an outside influence would caution or protect the prospective buyers before closing the sale.

*Id.* at 1278. The court was careful not to "insulate fraudulent conduct from the reach of the [Administrative] Code whenever the conduct occurs in connection with the sale . . . of a house."[25] *See id.* In factually similar cases in this district, Judges Dearie, Glasser, and Korman have all concluded that such conduct was consumer-oriented for the purposes of Section 349 liability. *See Barkley*, 2007 WL 2437810, at *18, *Banks*, 2003 U.S. Dist. LEXIS 8230, at *31-32, *Phillips*, 2003 U.S. Dist. LEXIS 27299, at *63-65. That there is no shortage of factually similar cases in this district involving these and other defendants, indicates that the conduct complained of is not unique to the parties, but has had ramifications for the public at large and is easily capable of repetition. The existence of these other cases thus undercuts the argument that the allegedly deceptive practices are not consumer-oriented. Therefore, the plaintiffs have "specifically alleged a standard pattern of deception employed by plaintiffs and presented

---

[25] BHD appeared to almost concede in that case that their alleged conduct would have been actionable and "consumer-oriented" under the broader state statute underlying the plaintiffs' claims here. *See Polonetsky*, 760 N.E.2d at 1277.

evidence to support such allegations." *Phillips*, 2003 U.S. Dist. LEXIS 27299, at *64. The admissions, adverse inference instruction, and the preclusion order, coupled with the documentary evidence of the 50 comparable transactions (with many similar terms and conditions in the respective contracts and appraisals[26]), raise at least the plausible inference that some of the defendants' practices broadly affected similarly-situated consumers.

The plaintiffs allege that misrepresentations (or omissions) were made with regard to the number of legal units in the dwellings, the defendants' intentions or responsibility to make the necessary repairs to the properties, the accompanying appraisals, and the nature of the relationships between defendants. Briefly, because at heart a deceptive practices claim is a lesser species of consumer fraud, material issues of fact remain as to whether the plaintiffs have demonstrated a materially misleading or deceptive practice, and how they have been harmed as a result. *See Phillips*, 2003 U.S. Dist. LEXIS 27299, at *61 ("For the same reasons that the defendants' actions can sustain a cause of action for fraud, they can be considered 'deceptive' to the reasonable consumer."); *Vaughn*, 2003 U.S. Dist. LEXIS 8233, at *10 ("[T]he following discussion of the claims of fraud applies with equal force to the claims of deceptive practices."). As long as the underlying conduct is consumer-oriented, what is fraud will be a deceptive practice under Section 349, although the converse cannot be said. In short, the plaintiffs allege that the defendants target vulnerable, inexperienced, unsophisticated home buyers and

---

[26] These include, but are not limited to the use of CLA as the appraiser, frequent use of Weinstock and David, the overall parity between the appraisal price and the purchase price, the clause in the appraisal making its valuation subject to the necessary repairs, and the lack of "construction or repair Riders" appended to the contracts. Overall, this does not establish that those 50 purchasers received the same representations as did White and the Councils regarding occupancy status, the promise of substantial repairs, or appraisal price. But in connection with the other evidence offered, there might be a legitimate inference that BHD used some of the same deceptive conduct with the 50 comparable purchasers; the documents themselves do not prove that such was the case. *See supra* note 19.

borrowers, and through various misrepresentations, omissions, and deceptions – including "steering" them to attorneys who allegedly do not safeguard their interests – induce them to enter into onerous mortgages that they would not otherwise conclude. There is enough evidence to support such allegations, though certainly not so much – particularly since it is disputed – as to warrant judgment as a matter of law in favor of the plaintiffs. Such practices do not seem far removed from the type of deceptive trade practice Section 349 was intended to prevent, even if the purchase of a home and accompanying mortgage transaction is not an orthodox example. *See Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 146 (2d Dep't 1995) ("The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising."). In addition, a reasonable consumer would likely rely on his attorney to protect his interests, and the deposition testimony by the plaintiffs establishes that the plaintiffs knew little about real estate transactions and relied on the guidance provided by David and Weinstock. In the circumstances of these cases, such facts evince materially misleading practices. For the reasons stated, material issues of fact remain with respect to the deceptive practices claim, and all motions seeking judgment as a matter of law on this cause of action ought to be denied.

### 2. Federal Discrimination Claims

The plaintiffs also bring federal discrimination claims under the Fair Housing Act and the Equal Credit Opportunity Act. The FHA forbids, *inter alia*, "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision or services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604. The FHA also makes it unlawful for "any person or other

entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605. Similarly, the ECOA makes it unlawful for a creditor to discriminate against a loan applicant on the basis of race, color, sex, national origin, religion, marital status, or age. 15 U.S.C. § 1691. Broadly speaking, FHA and ECOA claims may be prosecuted on the basis of (i) disparate treatment, i.e., that plaintiffs were treated differently because of their membership in a protected class, or on the basis of (ii) disparate impact, i.e., that the defendant's practices have a proportionally greater negative impact on minority populations. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 414, 425 (2d Cir. 1995); *Powell v. American General Finance, Inc.*, 310 F. Supp. 2d 481, 487 (N.D.N.Y. 2004). FHA plaintiffs who allege disparate treatment must show (1) "that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (citing *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979)); *see also Powell*, 310 F. Supp. 2d at 487. The proof required for an ECOA claim is essentially the same, but focuses on the loan rather than the rental or purchase of a dwelling, and varies the fourth FHA element with a requirement that the lender "showed a preference for a non-protected individual." *Powell*, 310 F. Supp. 2d at 487.

Of course, the plaintiffs cannot show and do not allege that the defendants did not rent or sell housing or extend credit to them. Nor have they shown (a) how or why they were treated *differently* from other groups, since they have not alleged or shown how the defendants have

treated other groups, or (b) the impact of the defendants' practices or policies. There is an argument on this basis that they cannot make out a *prima facie* case under the ECOA or the FHA. *See, e.g.*, *Masudi v. Ford Motor Credit* Co., No. 07-CV-1082, 2008 WL 2944643, at *4 (E.D.N.Y. July 31, 2008). The plaintiffs contend, however, that the defendants practice a form of discrimination by lending or providing housing to a group of persons on less favorable terms than those borrowers would have received if they were outside that particular class of persons. *See generally Matthews v. New Century Mortgage Corp.*, 185 F. Supp. 2d 874, 886 (S.D. Ohio 2002); *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7, 20-23 (D. D.C. 2000); *Barkley*, 2007 WL 2437810, at *13-15. The nature of this type of discrimination, inasmuch as the plaintiffs were not *denied* a loan or a housing opportunity on account race, but were allegedly *targeted* for unfavorable terms in connection with housing and a loan on account of race, should therefore trigger alternative legal considerations reflective of this different species of discrimination, allowing similarly-situated plaintiffs to establish a *prima facie* case of housing discrimination under the FHA and the ECOA. *See, e.g.*, *Matthews*, 185 F. Supp. 2d at 886-87 (allowing reverse-redlining FHA claim to proceed with evidence that borrowers received loans on "grossly unfavorable terms" and were "discriminated against in the terms of their credit based on" race); *Williams v. 2000 Homes Inc.*, No. O9-CV-16, 2009 WL 2252528, at *5 (E.D.N.Y. Jul. 26, 2009) (stating that fourth FHA element can be satisfied, at Rule 12 stage, with allegations of discriminatory intent or that the transaction was discriminatory); *Barkley*, 2007 WL 2437810, at *13-15 (allowing FHA reverse-redlining claim to proceed with evidence of "intentional targeting"). As the court observed in *Barkley*, limiting a plaintiff to proof only of disparate impact or disparate treatment in lieu of evidence of intentional targeting "would allow predatory

lending schemes to continue as long as they are exclusively perpetrated upon one racial group." 2007 WL 2437810, at *14 (citing cases). The court thus concluded that the broader approach was consistent not only with the FHA's aim of ending discrimination in making housing *unavailable* (denying access), but also with its goal of ending discrimination in the terms and conditions of the housing that *is* made available. *Id.* (citing cases). Courts have thus softened the requirements for establishing a *prima facie* case when reverse-redlining forms the substance of the discrimination claim, and have allowed such plaintiffs to show that they (i) were members of a protected class; (ii) applied for and were qualified for the housing or the loan; (iii) received grossly unfavorable terms; and (iv) were intentionally targeted or intentionally discriminated against. *See Matthews*, 185 F. Supp. 2d at 887-88; *Hargraves*, 140 F. Supp. 2d at 23; *Barkley*, 2007 WL 2437810, at *13-15. Therefore, of the various manifestations of federal housing discrimination, the only possible basis on which the claims may proceed is if the plaintiffs were intentionally targeted or discriminated against on the basis of race. *See, e.g.*, *Wiltshire v. Dhanraj*, 421 F. Supp. 2d 544, 554-55 (E.D.N.Y. 2005); *Matthews*, 185 F. Supp. 2d at 886-87; *Barkley*, 2007 WL 2437810, at *14; .

Firstly, as African-Americans, the plaintiffs are members of a protected class. Secondly, the evidence is clear that they applied to purchase a home and to borrow money. The evidence is less clear, at least with respect to Leo White, that he was *qualified* for the loan. It strikes the court as somewhat imprudent to extend nearly $300,000 in credit to a 21 year-old hotel bellman with little work experience, a monthly salary close to $2,000, no high school diploma, and roughly 3% down. Nevertheless, the court does not wish to substitute any judgment it has in lending practices for that of the defendants. Since White had held that job for two years, and

thus had a regular income, in addition to whatever rental income he would be able to bring in, there are legitimate arguments both ways as to his qualification for the loan. *See generally Matthews*, 185 F. Supp. 2d at 887; *Barkley*, 2007 WL 2437810, at *15. With two earners and a combined yearly salary approaching $75,000, there is also enough evidence that the Councils were qualified for their loan. Next, genuine issues of fact remain with respect to the third element – in these cases, receiving unfair or unfavorable terms or conditions. In *Barkley*, Judge Dearie found that a "grossly inflated appraisal" could constitute significantly unfavorable terms and conditions. 2007 WL 2437810, at *15. As the facts appear to be in dispute on whether and how the appraisals were grossly and fraudulently inflated, this element entitles neither party to summary judgment.

With respect to the fourth element, merely allowing the plaintiffs to show evidence of intentional targeting or discrimination does not mean they have presented adequate evidence that they were, in fact, intentionally targeted because they were African-American. The plaintiffs argue that the buyers in 47 of the 52 comparable sales (including the 2 sales to White and the Councils) were racial minorities.[27] A perusal of the addresses for the Schedule A and Schedule B properties as well as the records for the 50 other comparable sales, indicates that most are in heavily minority neighborhoods. It is no accident that Better Homes was not selling real estate on Park Avenue or Central Park West. But that over 90% of similarly-situated home buyers were minorities is not conclusive proof that, as a matter of law, the plaintiffs were intentionally targeted by BHD or MHE. Moreover, that over 90% of comparable sales were made to racial

---

[27] The plaintiffs appear to lump together racial minorities broadly, though the plaintiffs in both cases are African-American. The court is unsure what proportion of the 47 minority buyers is African-American, the specific protected class to which the plaintiffs belong. Regardless, the defendants do not appear to have taken issue with the plaintiffs' calculation and inclusion of other racial minorities.

minorities does not indicate that the purchasers in those sales also received grossly unfavorable terms.  In other words, just because White and the Councils may have received inflated appraisals and hollow promises, does not indicate one way or the other whether the 50 other buyers also received inflated appraisals and misrepresentations.  Thus, the court is hesitant to place too much value on the 90% figure; all it shows is that a great majority of comparable sales were made to racial minorities, not that all of those buyers received grossly unfavorable terms as well.  *See supra* notes 21 & 26.  While the plaintiffs may have been the ones who first contacted BHD (rather than the other way around), this does not mean that they were not "targeted" in the broader sense, or that generally speaking, the defendants did not take advantage of unsophisticated, first-time minority home buyers.  Employing African-American agents such as John and Styles, who appealed to potential purchasers that their job was a "personal mission" to help minorities achieve the American Dream of home ownership,[28] could show some degree of intentional targeting, as could advertising in heavily minority neighborhoods.  Similar, though not identical, practices were held in *Hargraves* to create a genuine issue of material fact with regard to intentional targeting on the basis of race.  *See* 140 F. Supp. 2d at 21-22; *see also Steed v. EverHome Mortg. Co.*, 308 Fed. Appx. 364, 368-69 (11th Cir. 2009); *Honorable v. Easy Life Real Estate Sys., Inc.*, No. 97-CV-6009, 1998 U.S. Dist. LEXIS 15872, at *16-18 (N.D. Ill. Sept. 30, 1998).  But selling real estate predominantly to minorities does not indicate, as a matter of law, that the plaintiffs were intentionally targeted as African-Americans.  A jury might well conclude that White and Council were targeted not on the basis of being African-American, but

---

[28] White's complaint makes such allegations, though the court does not recollect such testimony in the respective depositions.

because they were vulnerable, low-income, unsophisticated, first-time home buyers who *happened* to be African-American. It is unfortunate that buyers fitting that profile may be found in proportionally greater numbers in the African-American community, but that observation does not mean that the plaintiffs were targeted *because* of their race. Either way, that decision should be the fact-finder's call. The evidence one way or the other is not strong enough to entitle either party to judgment as a matter of law on the two discrimination claims. For these reasons, both summary judgment motions should be denied as to the FHA and ECOA claims.

### F.    Individual Liability

Next, several of the individual defendants, Eric Fessler and Nadine Malone, have moved for summary judgment with respect to the claims against them. There is much deposition testimony on Fessler's presence at meetings and the closing, and his participation in and knowledge of the alleged fraud and discrimination, though that appears much more true for Leo White than for the Councils. For the Council transaction, there is enough evidence to infer, if not establish directly, Fessler's participation in the critical events, although Linda Council has less of a recollection of Fessler being present at the closing than does White. Council also testified that Nadine Malone was present at closing. Fessler in particular, testified that he may have been the only "employee" of Better Homes for W-2 purposes, and that he was the "Boss," and maintained space at a BHD office in Ozone Park, Queens. According to Malone's deposition testimony, Fessler also signed a guarantee assuming liability for BHD's debts. White's complaint, a verified pleading, makes allegations not upon information and belief, as to Malone's presence at meetings with White and specific assurances she made to him. Thus as individuals and in their roles as President of Better Homes and Madison, respectively, there is

evidence of Fessler's and Malone's participation in and knowledge of the fraud. Consequently, neither Fessler nor Malone should be entitled to judgment as a matter of law on the claims asserted directly against them as individuals.

Lastly, the court notes Judge Gershon's recent finding that "disputed issues of material fact remain," in denying summary judgment in the *Miller* case. *M &T Mortgage Corp. v. Miller*, No. 02-CV-5410, 2009 WL 3806691, at *2 (E.D.N.Y. Nov. 13, 2009). While that decision does not necessarily mandate a similar outcome in these two cases, it is notable that the claims, parties, and counsel overlap to a great extent, as do the respective evidentiary showings at the summary judgment phase. As the parties are aware, prior orders in the *White* and *Council* cases, as well as in the *Miller* case have cross-referenced each other and have adopted the others' reasoning. Therefore, while there is a strong basis to deny summary judgment here independent of *Miller*, that decision lends additional support.

## CONCLUSION

Both sides seek to minimize the facts in dispute, but it is rather clear from the facts acknowledged and opposed that much remains in dispute, and that genuine issues of material fact remain. Even where a baseline fact is acknowledged by both parties– for example, that the plaintiffs were represented by counsel at closing – it is subject to diametrically opposed interpretations, as Weinstock's and David's loyalties are still very much in dispute, as is the role that the attorneys played at closing and in the larger mortgage and sale process. No party is entitled to judgment as a matter of law, and both sides should be entitled to present their theories of the case and ask the jury to make the legitimate, rational inferences that the claims might require and the evidence might warrant. In such circumstances, summary judgment is not an

appropriate disposition of the matters at hand. For the foregoing reasons, the undersigned respectfully recommends that the defendants' and third-party defendants' motions for summary judgment be DENIED, and that the plaintiffs' and third-party plaintiff's cross-motions for summary judgment be DENIED as well.

\*  \*  \*  \*  \*  \*  \*

Any objections to this Report and Recommendation must be submitted to Judge Garaufis within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully submitted,

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
   March 18, 2010